TRAUB LIEBERMAN STRAUS & SHREWSBERRY LLP
322 Highway 35 South
Red Bank, New Jersey 07701
(732) 985-1000
Attorneys for Plaintiff
Imperium Insurance Company

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| IMPERIUM INSURANCE COMPANY, | : | Civil Action No.: |
| | : | |
| Plaintiff, | : | |
| | : | |
| -v- | : | **DECLARATORY JUDGMENT** |
| | : | **COMPLAINT** |
| CAPIZOLA PANCARI LAPHAM & | : | |
| FRALINGER, P.A., VINCENT | : | |
| PANCARI, ESQ. AND MICHAEL | : | |
| FRALINGER, ESQ., | : | |
| | : | |
| Defendants. | : | |
| | : | |
| | : | |

NOW COMES Plaintiff, Imperium Insurance Company ("Imperium") by and through its attorneys, TRAUB LIEBERMAN STRAUS & SHREWSBERRY LLP, and submits this Complaint for Declaratory Judgment against defendant, Capizola Pancari Lapham & Fralinger, P.C. ("CPLF"), Vincent Pancari, Esq. and Michael Fralinger, Esq. as follows:

### INTRODUCTION

1.      Imperium brings this Complaint under 28 U.S.C. §§ 2201 and 2202 seeking a declaration regarding its coverage obligations owed to CPLF with respect to a legal malpractice lawsuit against CPLF, captioned *Marvin Raab and Vineland Kosher Poultry Plant, Inc. v. Capizola, Pancari, Lapham & Fralinger, P.A. and John Does 1-50*, brought in the Superior

Court of New Jersey, Camden County, Law Division, Docket No. CAM-L-689-17 (the "E&O Action").

2.      Imperium also seeks an Order requiring CPLF and Messrs. Pancari and Fralinger (together, the "Individual Defendants") to reimburse it for all defense fees, costs and expenses that Imperium has paid and will pay in defending CPLF and the Individual Defendants in the E&O Action.

3.      The Plaintiffs in the E&O Action, Vineland Kosher Poultry Plant, Inc. ("VKP") and one of its principals, Marvin Raab (together, the "E&O Plaintiffs"), allege that CPLF committed a myriad of negligent errors and omissions in the course of their representation in connection with VKP's sale of certain assets (the "Asset Sale"), including a kosher chicken manufacturing and distribution company (the "Assets"), to an entity called MVP Kosher Foods, Inc. ("MVP").

4.      The E&O Plaintiffs further allege that CPLF serially committed malpractice in connection with the Asset Sale and their representation before, during and after a two-part arbitration arising from the Asset Sale captioned *MVP Kosher Foods, LLC v. Vineland Kosher Poultry Plant, Inc. and Marvin Raab*, REF No. 1425012394 (the "Arbitration").

5.      Specifically, the E&O Plaintiffs assert that CPLF and the Individual Defendants committed at least 39 separate acts of malpractice (as described below at paragraph 76, which are incorporated herein) while the firm was, among other legal services, (a) preparing the Acquisition Documents, (b) representing VKP with respect to the Asset Sale, (c) related negotiations between VKP and MVP, and (d) during and after the Arbitration.

6.      Prior and after the Asset Sale, Mr. Fralinger and/or CPLF drafted, negotiated and/or revised the following documents:

        a.      an Asset Purchase Agreement (the "APA");

b.  a Security Agreement;

c.  a Bill of Sale with Schedules,

d.  a Promissory Note at a seven percent (7%) interest rate;

e.  a five-year Non-Compete Agreement running in favor of MVP;

f.  a six-year Deed Restriction for a kosher chicken manufacturing and distribution plant in Vineland, New Jersey (the "Plant"); and

g.  other documents necessary to consummate the Asset Sale.

(collectively, the "Acquisition Documents").

7.  In turn, the Arbitration was held in two separate proceedings. The first part of the Arbitration was conducted on June 26, 2013 (the "Initial Arbitration Hearing"). A reopened Arbitration hearing was held on November 5 and 6, 2013 (the "Reopened Arbitration Hearing").

8.  On July 30, 2013, after having conducted the Initial Arbitration Hearing and reviewing the parties' respective position statements and proposed findings of fact and conclusions of law, the Arbitrator issued an Interim Arbitration Award in favor of MVP and against *both* VKP and Mr. Raab, notwithstanding that Mr. Raab had not been a party or a signatory to the Acquisition Documents.

9.  Following the Arbitrator's publication of his Interim Arbitration Award, VKP and Mr. Raab replaced CPLF as their Arbitration Counsel with the law firm Duane Morris LLP.

10.  Upon its engagement, Duane Morris filed with the Arbitrator on VKP's and Mr. Raab's behalves a Petition to Reopen the Arbitration Hearing (the "Petition").

11.  After an additional round of briefing, the Arbitrator granted the E&O Plaintiffs' Petition in part, agreeing to reconsider certain of the remedies he had initially awarded to MVP in his Interim Arbitration Award.

12.     On or about November 5 and 6, 2013, the Arbitrator presided over the Reopened Arbitration Hearing. Messrs. Fralinger, Pancari and Raab each testified as a fact witness.

13.     On June 17, 2014, the Arbitrator, in part, modified his Interim Arbitration Award in favor of MVP and against both VKP and Mr. Raab in connection with the Asset Sale, again notwithstanding that Mr. Raab was neither a party nor a signatory to the Acquisition Documents (the "Final Arbitration Award").

14.     Over the course of CPLF's engagement, and possibly beginning as early as January 2011, less than one-month after the parties had executed the Acquisition Documents, if not before, Mr. Raab and other of CPLF's agents and outside counsel advised the Individual Defendants about what they perceived to be the firm's prejudicial negligent professional acts and omissions. In connection therewith, on one or more occasions, Mr. Raab and the other CPLF agents and counsel expressed to CPLF and the Individual Defendants their dissatisfaction with the firm's representation and identified certain alleged negligent professional acts and omissions they had committed in the course of their representation.

15.     On or about February 18, 2014 CPLF submitted an Application for Lawyers Professional Liability Insurance with Imperium.

16.     Notwithstanding their having knowledge of VKP's and Mr. Raab's dissatisfaction with the quality of CPLF's representations and their allegations of negligent professional acts and omissions, neither CPLF nor either of the Individual Defendants disclosed to Imperium that they had represented VKP in connection with the Asset Sale and thereafter or the allegations of negligent professional acts and omissions lodged against them by VKP and Mr. Raab.  CPLF also did not disclose that the Initial Arbitration Award had been entered against VKP and Mr. Raab or the remedies assessed against them.

17. The firm further did not disclose to Imperium that it had been replaced as VKP's and Mr. Raab's counsel following the Arbitrator's publication of his Initial Arbitration Award and prior to briefing and testimony with respect to the Reopened Arbitration.

18. Insofar as the E&O Plaintiffs had advised CPLF and/or each of the Individual Defendants of their views that CPLF and/or the Individual Defendants had been professionally negligent, CPLF and the Individual Defendants knew, prior to Imperium's issuance of the Imperium Policy, that they realistically could face, if not definitively would face, a malpractice lawsuit against one or all of them.

19. Alternatively, CPLF and the Individual Defendants could reasonably have foreseen that that their alleged professional negligence might be expected to be the basis of a malpractice lawsuit against one, two or all of them in light of the foregoing and the allegedly negligent professional acts and omissions described below.

20. Again, none of CPLF or the Individual Defendants disclosed any of the foregoing to any Imperium representative prior to Imperium's issuance of the Imperium Policy.

## NATURE OF THE DISPUTE

21.     This is an action for declaratory judgment and damages arising out of an actual and existing controversy concerning the parties' rights, status, and liabilities under a professional liability insurance Policy issued by Imperium to CPLF in connection with the E&O Action.  A true and correct copy of the Complaint filed in the E&O Action is attached hereto as Exhibit A.

22.     Imperium seeks a determination that it owes no duty to defend or indemnify CPLF or the Individual Defendants in respect of the E&O Action.  Imperium also seeks reimbursement of the attorneys' fees it has paid and will pay in defending CPLF and the Individual Defendants in the E&O Action.  Pending the resolution of this insurance coverage litigation, Imperium is continuing to defend CPLF and the Individual Defendants in the E&O Action.

## PARTIES

23.     Imperium is a corporation organized under the laws of the State of Texas with its principal place of business in Houston, Texas.

24.     Imperium provided certain Claims Made and Reported Lawyers Professional Liability insurance to CPLF, effective for the period April 1, 2014 to April 1, 2015 (the "Policy Period"), denominated Policy Number IFI 771518-01 (hereinafter referred to as the "E&O Policy" or the "Policy").

25.     On information and belief, at all material times, CPLF was and is a New Jersey professional corporation with its principal place of business in Vineland, New Jersey.

26.     CPLF is a law firm whose practice areas include Personal Injury, Workers' Compensation, Criminal Law, General Litigation, Municipal Court, Real Estate & Land Development, Collections & Foreclosures, and Wills & Estates.

27.     During the relevant period and thereafter, Messrs. Fralinger and Pancari were principals at CPLF and provided legal services to VKP and Mr. Raab in connection with the Asset Sale, resulting legal proceedings and other relevant matters.

## JURISDICTION AND VENUE

28.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332.  There is complete diversity between Imperium on the one hand and CPLF and the Individual Defendants on the other.  The amount in controversy exceeds $75,000.00.

29.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a).

## THE ARBITRATION

30.     As more fully described at paragraph 76, which is incorporated herein, the E&O Action, among other matters, is predicated on VKP's and Mr. Raab's assertions that :

a.     Mr. Fralinger and/or CPLF negligently prepared the Acquisition Documents;

b.     CPLF's attorneys committed legal malpractice in connection with and following Mr. Fralinger's and/or CPLF's preparation of the Acquisition Documents, including during and after negotiations over the parties' alleged breach of their duties and obligations under the Acquisition Documents;

c.     CPLF was negligent by failing to prevail in litigation it initiated on VKP's behalf to enforce MVP's duties and obligations under the Asset Sale Documents, which litigation was dismissed by a court in favor of Arbitration.  See *Vineland Kosher Poultry Plant, Inc. v. MVP Kosher Foods, LLC*, filed in the Superior Court of New Jersey, Cumberland County, and docketed at Civil Action No. CUM-L-00711-12 (the "Litigation"); and

d. CPLF and the Individual Defendants committed serial negligent professional acts and omissions in connection with their representation of VKP and Mr. Raab prior to, during and after the Arbitration.

### A. The Acquisition Documents

31. In or about the summer of 2010, VKP retained CPLF to serve as its legal counsel with respect to the Asset Sale.

32. On or about September 16, 2010, VKP and MVP entered into the APA.

33. The total consideration to be paid by MVP to VKP was $4 million. Of that consideration, approximately $2,750,000 was paid at or prior to settlement, in accordance with the APA. The balance of $1,250,000 was to be paid in accordance with the terms of the Promissory Note, which provided for quarterly interest only payments for eighteen (18) months beginning on March 30, 2011, followed by principal and interest payments for 30 months beginning September 30, 2012. A final payment of the total outstanding balance was due on December 30, 2014.

34. MVP paid an additional $692,000 for inventory and equipment.

35. Authorized representatives of VKP and MVP executed the Acquisition Documents on or about December 30, 2010.

### B. MVP's June 30, 2012 Quarterly Interest Payment and VKP's Notice of Default

36. In accordance with the Promissory Note, MVP timely made the requisite March 2011, June 2011, September 2011, December 2011, and March 2012 quarterly payments to VKP.

37. MVP's next quarterly interest only payment of $21,875 normally would have been due on June 30, 2012 (the "June Payment"). Pursuant to the terms of the Promissory

Note, however, the June 30, 2012 interest only payment was due on July 2, 2012 because June 30, 2012 was a Saturday and July 1, 2012 was a Sunday.

38.    On or about July 2, 2012, Mr. Raab contacted MVP's bookkeeper requesting immediate payment of the interest only amount of $21,875 to avoid a default.

39.    On July 9, 2012, Mr. Fralinger and/or CPLF, on VKP's behalf, transmitted a notice of default to MVP.

40.    On July 10, 2012, MVP wired the June Payment to VKP.

41.    VKP received and accepted the June Payment that same day.

42.    Notwithstanding VKP's receipt and acceptance of MVP's July 10, 2012 payment, CPLF, on VKP's behalf, took the position that as of that date, MVP had an obligation under the APA and the Promissory Note to pay to VKP principal in the amount of $1,250,000.  CPLF further asserted that MVP had an ongoing obligation to pay interest on this amount.

43.    Mr. Fralinger and/or CPLF also claimed that as of July 10, 2012, the Security Agreement required that an amount equal to not less than 50% of the outstanding  principal balance of  the  Promissory Note had to be retained by MVP's primary distributors.

44.    MVP challenged VKP's declaration of default, asserting that it had been called prematurely, i.e., before the end of the "Cure Period" that had previously been agreed upon between VKP, Mr. Raab and MVP.

45.    At or about the same time, CPLF, on VKP's behalf, sent letters to two of the MVP's primary distributors, stating that all receivables payable by them to MVP should be withheld.

46.    Following their receipt of CPLF's letters, the subject distributors advised MVP that they would not issue any past or then-present payments to it while its dispute with VKP was pending.

47.     VKP also withheld receivables that MVP claimed were due to it.

48.     MVP quantified the amount of receivables withheld by VKP at $323,620.

49.     Vineland Specialties contested the amount MVP claimed it was due, asserting that the actual amount of withheld receivables was $265,879.36.

50.     According to MVP, as a result of these developments, it was left with no feasible or practical way to market and distribute a significant percentage of its products, which were highly perishable, insofar as the chickens had to be slaughtered, processed and shipped to customers within 48 hours.

51.     On July 12, 2012, MVP ceased operations and closed permanently.

52.     On August 6, 2012, MVP's counsel emailed Mr. Fralinger and VKP detailing that the notice of default was unlawful because it was served via email, which was not authorized by the Promissory Note.  MVP's counsel's email continued that VKP did not have the right to accept a payment that cured a default and then declare a default.

53.     On this basis, MVP's counsel requested that Mr. Fralinger withdraw the default and threatened suit against Mr. Raab and VKP.

54.     On or about August 9, 2012, Mr. Fralinger and/or CPLF, on VKP's behalf, served a second Notice of Default of MVP for its having ceased business operations and/or ceasing the processing of poultry under the Assets' Trade Names.

55.     On or about August 13, 2012, MVP's counsel wrote to Mr. Fralinger detailing that VKP's July 10, 2012 declaration of default was the proximate cause of MVP's cessation of business operations and inability to make future payments in satisfaction of MVP's Promissory Note in favor of VKP.

### C.     CPLF initiates the Litigation on VKP's Behalf

10

56.     On or about August 20, 2012, CPLR, on VKP's behalf, filed and served on MVP a Verified Complaint in the Litigation despite the inclusion of a mandatory arbitration clause in the Acquisition Documents.

57.     On September 18, 2012, the Court in the Litigation issued an Order compelling Arbitration and dismissing VKP's Verified Complaint.

**D.      MVP Initiates the Arbitration against VKP and Mr. Raab and They, in turn, Counterclaim against MVP**

58.     In September 2012, counsel for MVP submitted a demand for arbitration to JAMS.

59.     Among other claimed relief, MVP requested that the Arbitrator issue an Order:

a.      holding that Mr. Raab, individually, and VKP breached the Acquisition Documents as well the associated implied covenant of good faith and fair dealing;

b.      rescinding the APA;

c.      declaring that the parties' Non-Compete Agreement and Deed Restriction remained in effect;

d.      declaring that MVP was never in default under the Note;

e.      awarding it damages in the amount of the purchase price it paid at closing and any and all payments made thereafter;

f.      finding that the restrictive covenants contained in the APA remained in effect for five (5) years, until December 30, 2015, based on VKP's  alleged breach of the implied covenant of good faith and fair dealing;

g.      declaring that under the APA, VKP was obligated to indemnify  it  for the reasonable legal fees it incurred in connection with a claim that had been brought against it and one of its principals; and

h.     Compelling VKP and Mr. Raab to reimburse to it all legal fees and Arbitration costs that it had incurred.

60.    In turn, VKP counterclaimed against MVP, requesting, among other things:

a.     counsel fees and costs incurred in this action if MVP was found to have defaulted;

b.     a finding that restrictions in the non-compete agreement and deed restriction automatically terminated at the time of the default;

c.     the return of the VKP trade names; and

d.     damages.

### i.     The Arbitrator's Interim Order

61.    On July 30, 2013, the Arbitrator issued an Interim Order (the "Interim Order"). Among the conclusions reached, he found that:

a.  Both VKP and Mr. Raab had breached the APA as well as the covenant of good faith and fair dealing;

b.  MVP did not default;

c.  VKP's breach caused the shutdown of MVP's operations; and

d.  Mr. Raab was personally liable for damages arising out of the breach.

Based on the foregoing, the Arbitrator's Interim Award ordered that, among other things:

a.     VKP and MVP rescind the APA;

b.     VKP and Mr. Raab return the purchase price that MVP had paid to VKP;

c.     the non-compete agreement and deed restrictions were declared null and void;

12

      d.     MVP return all of the trade names it had purchased to VKP; and

      e.     VKP and Mr. Raab reimburse to MVP its legal fees and Arbitration costs.

Conversely, the Arbitrator denied MVP's request for reimbursement of the accounts receivable that VKP had withheld from it.

      ***ii.***     ***VKP's and Mr. Raab's Petition to Reopen the Arbitration***

62.    Following the Arbitrator's publication of the Interim Award, VKP and Mr. Raab terminated CPLF as their counsel and replaced it with the law firm of Duane Morris.

63.    On information and belief, the E&O Plaintiffs and/or others on their behalves advised CPLF and/or each of the Individual Defendants that they were being replaced as counsel because they had been professionally negligent and/or had committed malpractice in connection with their representation.

64.    On August 29, 2013, Duane Morris filed with the Arbitrator a Petition to reopen the Arbitration Hearing.

65.    Specifically, Duane Morris challenged the Arbitrator's findings that, among other things:

      (a) rescission was an appropriate remedy;

      (b) Mr. Raab was individually liable to MVP;

      (c) MVP had breached the Security Agreement; and

      (d) Mr. Raab had breached the Non-Compete Agreement.

66.    On September 27, 2013, the Arbitrator issued an Order granting in part and denying in part Duane Morris's Petition.

67.    In his Order, the Arbitrator re-opened the Arbitration Hearing with respect to the following issues only:

      (a)     whether  rescission was an appropriate remedy; and

(b)      whether Mr. Raab should he held individually liable.

68.      Conversely, the Arbitrator denied Duane Morris's requests to further arbitrate:

(a)      whether MVP had breached the security agreement; and

(b)      whether Mr. Raab had breached the Non-Compete Agreement.

69.      Among the reasons the Arbitrator gave in support of his decision to deny Duane Morris's request to further arbitrate whether MVP had breached the Security Agreement was his determination that:

> "that claim was insufficiently plead [by CPLF] or raised in post
>
> hearing submissions…."

70.      On November 5 and 6, 2013, the Arbitrator presided over the Reopened Arbitration Hearing.

71.      At the conclusion of the Hearing, the Arbitrator withdrew his decision to order rescission.  On the other hand, he affirmed his decision to hold Mr. Raab individually liable under the APA.

## **THE E&O ACTION**

72.     The Complaint filed in the E&O Action (the "Complaint") alleges that CPLF and the Individual Defendants breached their fiduciary duties as well as their contractual obligations and committed legal malpractice in the course of their representation of VKP in the Arbitration.

73.     VKP and Mr. Raab (the "E&O Plaintiffs") allege that CPLF and the Individual Defendants, in conjunction with their representation of VPK, committed a series of negligent professional acts and omissions both with respect to VKP's asset sale to MVP and in connection with the resulting arbitration between the E&O Plaintiffs and MVP, wherein an Arbitrator held VKP and Mr. Raab jointly and severally liable to MVP for over $2,028,183 million in damages.

74.     The Arbitrator further held that in the event VKP was unable to pay the award to MVP, Mr. Raab was personally responsible for doing so, notwithstanding that he was not a party to any of the Acquisition Documents related to or giving rise to the Asset Sale, and had no ability to engage in any acts or omissions that could have caused damage or harm to MVP as a result of the transaction.

75.     According to the E&O Plaintiffs' Complaint against CPLF and the Individual Defendants, their alleged negligent professional acts and omissions directly lead to the adverse judgment against the E&O Plaintiffs in the Arbitration and were the proximate cause of the damages assessed against them by the Arbitrator.

76.     Specifically, VKP and Mr. Raab allege that in connection with CPLF's representation of VKP, prior to, in the course and after the conclusion of the Arbitration, CPLF and the Individual Defendants committed the following material negligent professional acts and omissions giving rise to the Arbitrator's findings and award against the E&O Plaintiffs in the Arbitration, many of which professional acts and omissions Mr. Raab had complained about to CPLF throughout the course of the firm's representation:

15

a.      Prior the closing of the APA, CPLF failed to timely investigate whether the collateral referenced in the Security Agreement was free and clear of any then-existing liens and encumbrances not previously disclosed by MVP in writing.  In fact, the collateral was not free and clear at the time of the closing, causing MVP's security interest in the assets to take a second priority position rather than a first priority position.   VKP's insistence on a first priority security interest was a material term of the asset sale, without which, VKP alleges that it would never have sold the assets to MVP;

b.      CPLF failed to discover the preexisting lien before the Closing Date or within a reasonable time after closing, which would have revealed that the collateral was worthless to VKP;

c.      CPLF failed to approach MVP's counsel about the prior lien or make its subordination a condition for closing;

d.      CPLF failed to timely file a UCC-1 with the State of Nevada to perfect MVP's first priority security interest in the collateral, thereby enabling another party to perfect its own security interest in the assets prior to the date of CPLF's filing, resulting in VKP having a second priority position, rather than a first priority position, as was required;

e.      CPLF failed to perform a post-closing lien search within thirty days of the closing, as was standard operating procedures for counsel in this situation;

16

f.      CPLF failed to perform any subsequent lien search to reaffirm that VKP's security interest was first in line;

g.      CPLF failed to timely advise the E&O Plaintiffs that MVP had materially misrepresented that the collateral was free and clear of all liens and that VKP had a first priority position.  As a corollary, CPLF did not advise the E&O Plaintiffs that MVP had breached the Security Agreement and was in default upon execution of the Acquisition Documents;

h.      CPLF did not declare that MVP was in default as of the moment the parties signed the Acquisition Documents.  Had it done so, VKP would not have had any obligation to provide MVP with notice before accelerating the amount due under the Promissory Note and declaring the entire amount due and payable;

i.      The Assignment Agreement included a provision at Section 6 that said that MVP would indemnify VKP for all amounts expended to protect its interests, including court costs. Notwithstanding, CPLF did not assert that VKP was entitled to be indemnified by MVP immediately upon the Closing;

j.      In drafting the Acquisition Documents, Mr. Fralinger included conflicting provisions governing the timing as to which a default could be declared and a Notice of Default could be transmitted to MVP on VKP's behalf, rendering the timing provisions ambiguous;

k.      CPLF miscalculated the timing with respect to which MVP would be in default of the parties' agreements had it not cured any breaches in a timely manner in accordance with the agreements' terms and conditions;

l.      CPLF wrongfully advised VKP that it could declare a default of the parties' agreements by MVP, notwithstanding that MVP had timely cured its breaches prior to the date a default could be declared, thereby vitiating VKP's right to declare a default;

m.      CPLF advised VKP that the Note executed by the parties did not contain a pre-declaration of default notification requirement, even though it did;

n.      CPLF declared and notified MVP on VKP's behalf that MVP had breached and was in default of the parties' agreements on several bases, none of which turned out to be the case;

o.      CPLF failed to properly serve MVP with a Notice of Default by transmitting the document to MVP by way of email rather than by regular mail, overnight delivery or facsimile, as was required by the parties' agreements and as  is customary in the industry;

p.      MVP asserts that it tried to timely wire the funds to VKP but it was unable to do so because CPLF allegedly provided it with erroneous wiring instructions, thereby prejudicing MVP's ability to timely cure any claimed breaches of the Acquisition Documents;

q.      When MVP's counsel threatened to sue both VKP and Mr. Raab individually if Mr. Fralinger did not withdraw the default notices he had filed, Mr. Fralinger failed to advise Mr. Raab of the implications of a suit against him personally;

r.      Mr. Fralinger failed to advise Mr. Raab of the implications of a suit against him personally if VKP did not withdraw its improper Notice of Default;

s.      Mr. Fralinger failed to recommend that VKP withdraw its improper Notice of Default, notwithstanding MVP's counsel's threat to sue both VKP and Mr. Rabb personally if MVP did not do so;

t.      MVP's counsel's advised Mr. Fralinger that VKP's first declaration of default was the proximate cause of MVP's cessation of business operations; notwithstanding, CPLF did not withdraw the subject declaration of default;

u.      Mr. Fralinger wrongly served a second improper Notice of Default on MVP on August 20, 2012 based on MVP's cessation of its business operations and/or the processing of kosher poultry under the VKP Trade Name;

v.      Mr. Fralinger improperly took steps to freeze certain of MVP's assets;

w.      CPLF was the proximate cause of MVP's cessation of business operations;

x.      In drafting the APA, Mr. Fralinger included a mandatory arbitration provision without advising the E&O Plaintiffs of its impact or obtaining their consent;

y.      Notwithstanding the arbitration provision's inclusion in the APA, Mr. Fralinger incurred the time and expense of filing a lawsuit against MVP which was ultimately dismissed in lieu of arbitration;

z.      Even though the APA provided for a three person arbitrator panel, CPLF agreed to use one arbitrator whom its attorneys had never before worked with.  In fact, no one at CPLF had previously worked with the arbitration service provider identified in the APA;

aa.     CPLF did not obtain the E&O Plaintiffs' informed consent with respect to the mediation logistics or arrangements;

bb.     CPLF did not counsel the E&O Plaintiffs on the risks of arbitration versus settlement or advise them that a settlement offer had been made.  In fact, CPLF recommended against settlement and assured the E&O Plaintiffs that they would prevail in the arbitration;

cc.     CPLF failed to conduct formal discovery prior to the arbitration hearing.  While it emailed MVP's counsel informally requesting certain documents, it never received the requested materials.  Compounding the situation, MVP relied on documents at the arbitration that had not been produced to CPLF and of which the E&O Plaintiffs were unaware;

dd.     CPLF did not request or obtain a stenographic recording of the arbitration hearing;

ee.     Unbeknownst to the E&O Plaintiffs, CPLF did not challenge or argue against the inclusion of Mr. Raab personally in the arbitration.  Mr. Rabb's inclusion therein provided the vehicle by which he was found liable as a guarantor for the damages awarded to MVP against VKP, notwithstanding that he was not a party to the APA or any of the other deal documents;

ff.     VKP asserted counterclaims against MVP in the arbitration.  According to the E&O Plaintiffs, but for CPLF's negligence, VKP would have prevailed on one or more of its counterclaims;

gg.     CPLF never argued at the arbitration that MVP was in default immediately upon the closing of the APA as a result of its having agreed to a prior first encumbrance on the collateral;

hh.     CPLF also failed to advise MVP that it had breached the Promissory Note  and was in default as a result of the prior encumbrance on the collateral;

ii.     CPLF failed to advise MVP within five days of the Promissory Note's execution that it was in default under the Acquisition Documents because the collateral already had a first encumbrance on it;

jj.     The Assignment included a provision at Section 6 that said that MVP would indemnify VKP for all amounts expended to

protect its interests, including court costs.  Notwithstanding, CPLF failed to assert that VKP was entitled to be indemnified by MVP;

kk.     As a result of CPLF's alleged negligence, the E&O Plaintiffs were forced to incur the expense of retaining Duane Morris to represent their interests following the entry of the Interim Arbitration Award;

ll.     On August 27, 2012, a theretofore unknown junior lienholder wrote to CPLF advising that MVP was in default under a Factoring and Security Interest Agreement dated March 11, 2011 that granted a security interest in the same collateral as that which secured VKP's lien.  While CPLF wrote a letter to the junior lienholder on September 12, 2012 objecting to its acceptance of any collateral in which VKP held a security interest and advised the junior lienholder that in accordance with the UCC, it could not accept any such collateral, CPLF did not timely advise VKP that MVP was in further breach of those sections of the parties' agreements which barred MVP from further encumbering the collateral.

mm.     CPLF failed to perform a lien search to determine whether there were any other encumbrances on the collateral, whether prior or subsequent to the closing of the APA, after having learned on or about August 27, 2012 of the junior lienholder's existence and the fact that MVP had another encumbrance on the collateral.  Had CPLF done so, it would have discovered the first lien and been in a

position to declare a breach of the parties' agreements by MVP and thereby hold it in default in accordance with those documents; and

nn.     As a result of CPLF's alleged negligence, the E&O Plaintiffs were forced to incur the expense of retaining counsel to initiate and pursue a legal malpractice claim against the firm, thereby suffering additional damages as the result of CPLF's erroneous acts and omissions.

77.     Based on the foregoing, the E&O Plaintiffs have requested that the court in the E&O Action enter judgement against CPLF and the John Does, jointly and severally, for all compensatory damages, together with interest, disgorgement of attorneys' fees already paid to CPLF with respect to the MVP transaction and the subsequent arbitration, attorneys' fees, costs of suit and such further relief as the court deems equitable and just.

## CPLF'S REPRESENTATIONS AND CERTIFICATION UPON WHICH IMPERIUM RELIED IN AGREEING TO ISSUE THE IMPERIUM POLICY

78.     On February 18, 2014, approximately seven months after the Arbitrator's Initial Arbitration Award against VKP and Mr. Raab, CPLF submitted to Imperium its Application for Lawyers Professional Liability Insurance.

79.     In its Application, dated February 18, 2014, CPLF represented to Imperium in response to question number 30.b. on page 7 of 13 that after inquiry, none of the firm's attorneys was aware "of any legal work or incidents that might reasonably be expected to lead to a claim or suit against them."  No mention was made of the alleged Wrongful Acts that ultimately gave rise to the filing of the Action.  Attached at Exhibit B.

80.     CPLF reaffirmed this representation to Imperium on page 10 of 13 of the Application, wherein it was again asked to advise Imperium if it was "aware of an incident"

occurring within the prior five years which may give rise to a malpractice claim against it or any of its attorneys.   Once again, CPLF did not identify or provide Imperium with any advice concerning the alleged professional errors and omissions that ultimately gave rise to the filing of the Arbitration.  Absent any such advice, and in reliance thereon, Imperium provisionally agreed to issue the Policy.

81.     On March 11, 2014, again prior to the issuance of the Imperium Policy, CPLF presented Imperium with a letter certifying that its President was:

> "… not aware of any claims, potential claims, disciplinary matters, investigations, or circumstances that may give rise to a claim. I/we have specifically asked all lawyers and employees if they have any knowledge of any claim, potential claim, disciplinary matter, investigation or circumstance that may give rise to a claim that is not listed in our application dated 2/18/2014.
>
> All lawyers and employees have answered no.
>
> This will also certify that to the best of my/our knowledge the information given on the application is unchanged since it was completed on 2/18/2014.
>
> I/we declare above statements to be true.  The signatory below is acting on behalf of all insured's.
>
> I/we understand and agree that this letter is a part of our policy application and becomes a part of the policy."

82.     Yet again, CPLF did not advise Imperium of the alleged malpractice that ultimately would give rise to the filing of the E&O Action.  Instead, the firm certified the veracity of its prior representations that it was not aware of any such professional errors or omissions, notwithstanding that the subject alleged malpractice occurred during the period beginning in September 2010 and running at least up to and through the date that Imperium issued the Imperium Policy.

24

83.     In reliance on CPLF's representations and certification, Imperium issued the Imperium Policy, which became effective on April 1, 2014.

## THE IMPERIUM POLICY

84.     The Imperium Policy potentially covers certain Claims first made against CPLF during the period the Policy was in effect, to wit, April 1, 2014 to 2015, and which were reported to Imperium during the Policy Period or within sixty (60) days thereafter.

85.     The Policy provides a limit of liability of $2 million each claim and $2 million Annual Aggregate, excess of a $15,000 deductible applicable to Damages, as well as a separate $2 million Aggregate for Claims Expenses.

86.     Under Insuring Agreement I.A. of the Imperium Policy, Imperium agreed to pay on behalf of CPLF all Damages in excess of the deductible that CPLF and certain of its attorneys become legally obligated to pay as a result of certain Claims first made against one or more of them during the Policy Period and timely reported to Imperium by reason of any Wrongful Act occurring on or after the applicable Retroactive Date, which, in the case of CPLF, is February 1, 1981.

87.     Per the Policy's Coverage Form, the Policy was issued in consideration of the payment of the premium and in reliance upon the statements in the application and the supplements attached thereto, which are made a part of the Policy.  The Policy also includes certain terms, conditions, exclusions, endorsements and other provisions that also are relevant to the availability of coverage.

88.     Subject to the Imperium Policy's terms, conditions, definitions, exclusions, endorsements and other provisions, certain of which are described below at paragraphs 89-92, the Policy is intended to cover **Wrongful Acts** (as defined) occurring on or after the Imperium

Policy's Retroactive Date of February 1, 1981 (as to CPLF) for **Claims** (as defined) first made against CPLF, among others, during the **Policy Period** (as defined) and which are reported to Imperium in writing during the **Policy Period** or within sixty (60) days thereafter.

89.     Specifically, the Imperium Policy contains the following **INSURING AGREEMENT**:

> ## I.     COVERAGE – PROFESSIONAL LIABILITY
>
> The Company shall pay on behalf of any **INSURED** all **DAMAGES** in excess of the deductible which any **INSURED** becomes legally obligated to pay as a result of **CLAIMS** first made against any **INSURED** during the **POLICY PERIOD** and reported to the Company in writing during the **POLICY PERIOD** or within sixty (60) days thereafter, by reason of any **WRONGFUL ACT** occurring on or after the **RETROACTIVE DATE**, if any. Coverage shall apply to any such CLAIMS arising out of the conduct of the **INSURED'S** profession as a Lawyer, or as a Lawyer acting in the capacity of an Arbitrator, Mediator, Neutral, Title Insurance Agent, Notary Public, A Governmental Affairs Advisor, Lobbyist, member, director, officer of any Bar Association, its governing board or any of its committees, or as a member of a formal accreditation, ethics, peer review, licensing board, standards review or similar professional board or committee relating to the practice of law.

The Imperium Policy also contains the following relevant definitions at section **XI.**

**DEFINITIONS**:

> 2.  **CLAIM** means a demand made upon any **INSURED** for **DAMAGES,** including, but not limited to, service suit or institution of any alternative dispute resolution proceedings against any **INSURED**…
>
> 3.  **CLAIMS EXPENSES** means:
>
>     A.  fees charges by any lawyer designated by the Company to defend the insured; and
>
>     B.  if authorized by the Company, all other fees, costs and expenses resulting from the investigation, adjustment, defense or appeal of any **CLAIM**, including but not limited to:

1.  all costs taxed against any INSURED and all interest which accrues after the entry of any judgment and before the Company has tendered or deposited, in court or otherwise, such judgment amount for which any INSURED is liable; and

2.  Premiums on appeal bonds and premium on bonds to release attachments in such suits.  The Company shall have no obligation to provide such bonds.

3.  Claims Expenses shall not include salaries and expenses of regular employees or officers of the Company.

4.  **DAMAGES** means the monetary and compensatory portion of any judgment, award or settlement.  Damages also include those amounts the court is permitted to impose on a debt collector as set forth in 15USC §1692k(a); provided always that DAMAGES shall not include:

A.  legal fees, commissions, compensation, costs and expenses paid or incurred or charged by the insured, no matter whether claimed as restitution of specific funds, forfeiture, financial loss, set off or otherwise and injuries that are a consequence of any of the foregoing:

sanctions, forfeiture, penalties or criminal fines, however, the **COMPANY** shall pay up to $10,000 in the **AGGREGATE** for the **POLICY PERIOD** for awards under RULE 11 of the Federal Rules of civil procedure or its State counterpart;

B.  matters deemed uninsurable;

C.  injunctive or declaratory relief or any form of non-monetary relief;

D.  **DAMAGES** rendered pursuant to the Racketeer Influenced and Corrupt Organizations Act of 1970 (commonly known as RICO}, Title 18 U.S.C. Section 1960, at seq., or any similar federal or state statute or law.

\*        \*        \*

12. **POLICY PERIOD** means the period from the effective date of this policy to the expiration date as set forth in the Declarations or earlier termination date, if any, of this policy.

\*        \*        \*

15. **PROFESSIONAL SERVICES** also means any services arising out of the conduct of the INSURED'S profession as a Lawyer, Lobbyist,

27

Gov't Affairs Advisor, or as a Lawyer acting in the capacity of an Arbitrator, Mediator, Neutral Fact Finder, Title Insurance Agent, or Notary Public, or as a member, director, or officer of any Bar Association, its Governing board or any of its committees.   The definition of **PROFESSIONAL SERVICES** shall include services any **INSURED** performs as an author or publisher of legal research papers, legal materials or while preparing materials and presenting legal seminars but only where such services are performed without compensation or compensation per publication, presentation or seminar is less than $30,000.

*        *        *

**21. WRONGFUL ACT(S)** means any actual or alleged:

- A. act;
- B. error,
- C. omission;
- D. misstatement;
- E. misleading statements;
- F. neglect or breach of duty, network privacy; or
- G. personal injury; or
- H. advertising injury.

90.     The Imperium Policy contains the following exclusion at **Section XII. Exclusions**, Exclusion No. II (the "Prior Knowledge Exclusion"),  which states as follows:

This policy does not apply to:…

**II.**   any **CLAIM** arising out of any **WRONGFUL ACT** occurring prior to the effective date of this policy if:

*        *        *

B. if the **INSURED** at or before the effective date knew or could have reasonably foreseen that such **WRONGFUL ACT** might be expected to be the basis of a **CLAIM**….

91.     The Imperium Policy also includes at **Section IV.**   a number of **Conditions**, including **Condition No. XIV.**, entitled **ENTIRE AGREEMENT**, which states:

By acceptance of this policy, all **INSUREDS** reaffirm as of the effective date of this policy that:

A. the   statements   in   the   application   including   all   information communicated by the **INSURED** to the Company, attached hereto and

made a part hereof, are all **INSUREDS'** agreements and representations,

B.  this policy is issued in reliance upon the truth and accuracy     of such representations; and

C.  this policy embodies all agreements between all **INSUREDS** and the Company or any of its agents relating to this insurance.

92.     At the same time, the Imperium Policy includes an Endorsement entitled "**Prior and Pending Litigation Endorsement**," which, as potentially relevant to the instant insurance claim, provides that Imperium has no duty to defend or indemnify CPLF for, and the Imperium Policy does not apply to, any Claim based upon or arising out of any demand as of April 1, 2014. Thus, to the extent a demand by a third party is made against CPLF prior to April 1, 2014, there would be no coverage under the Policy.

## CLAIMS FOR RELIEF

## COUNT I

### Declaratory Judgment vs. CPLF and the Individual Defendants (Prior Knowledge: Duty to Defend)

93.     Imperium repeats, realleges and incorporates by reference each and every allegation contained in the preceding paragraphs of this Complaint as though fully set forth herein.

94.     Imperium has no duty to defend CPLF or the Individual Defendants in the E&O Action, as they each knew, or could have reasonably foreseen, that the **WRONGFUL ACT** giving rise to the E&O Plaintiffs' lawsuit against them might be expected to be the basis of a **CLAIM.** As such, the Imperium Policy's Prior Knowledge Exclusion applies and bars coverage.

95.     At the same time, Imperium has no duty to defend CPLF or the Individual Defendants in the E&O Action based on the application of the Imperium Policy's Prior and

Pending Litigation Endorsement, insofar as, based on information and belief, as of April 1, 2014, a Claim already had been made against CPLF based upon or arising out of a demand by a third party.

96.     Moreover, Imperium has no duty to defend CPLF or the Individual Defendants based on their individual and/or collective material breach of the Imperium Policy's Entire Agreement provision.

97.     Given the foregoing, Imperium has no duty to defend CPLF or the Individual Defendants in the E&O Action.

WHEREFORE, Imperium seeks a judgment (a) declaring the rights and obligations of Imperium under the Imperium Policy as respects the E&O Action; (b) declaring that Imperium does not owe a duty to defend CPLF or the Individual Defendants under the Imperium Policy with respect to the E&O Action; and (c) providing such other and further relief as this Court may deem just and equitable.

## COUNT II

### Declaratory Judgment vs. CPLF and the Individual Defendants (Prior Knowledge: Duty to Indemnify)

98.     Imperium repeats, realleges and incorporates by reference each and every allegation contained in the preceding paragraphs of this Complaint as though fully set forth herein.

99.     Imperium has no duty to indemnify CPLF or the Individual Defendants in the E&O Action, as they each knew, or could have reasonably foreseen, that the **WRONGFUL ACT** giving rise to the E&O Plaintiffs' lawsuit against them might be expected to be the basis of a **CLAIM.**   As such, the Imperium Policy's Prior Knowledge Exclusion applies and bars coverage.

100.     At the same time, Imperium has no duty to indemnify CPLF or the Individual Defendants in the E&O Action based on the application of the Imperium Policy's Prior and Pending Litigation Endorsement, insofar as, based on information and belief, as of April 1, 2014, a Claim already had been made against CPLF based upon or arising out of a demand by a third party.

101.     Moreover, Imperium has no duty to indemnify CPLF or the Individual Defendants based on their individual and/or collective material breach of the Imperium Policy's Entire Agreement provision.

102.     Given the foregoing, Imperium has no duty to indemnify CPLF or the Individual Defendants in the E&O Action.

WHEREFORE, Imperium seeks a judgment (a) declaring the rights and obligations of Imperium under the Imperium Policy as respects the E&O Action; (b) declaring that Imperium does not owe a duty to indemnify CPLF or the Individual Defendants under the Imperium Policy with respect to the E&O Action; and (c) providing such other and further relief as this Court may deem just and equitable.

`                                       **COUNT III**

**Declaratory Judgment vs. CPLF and the Individual Defendants (Right to Reimbursement)**

103.     Imperium repeats, realleges and incorporates by reference each and every allegation contained in the preceding paragraphs of this Complaint as though fully set forth herein.

104.     Insofar as there is no coverage under the Imperium Policy, Imperium has no duty to defend or indemnify CPLF or the Individual Defendants in the E&O Action.

105.    This Court should declare that under the Imperium Policy, Imperium is entitled to be reimbursed by CPLF and the Individual Defendants with respect to the fees, costs and expenses it has paid and will pay in defending them in the E&O Action as well as for any and all other damages that Imperium has incurred or may incur in connection with their defense in the E&O Action.

WHEREFORE, Imperium seeks a judgment (a) declaring the rights and obligations of Imperium under the Imperium Policy as respects the E&O Action; (b) declaring that CPLF and the Individual Defendants must reimburse Imperium with respect to the fees, costs and expenses it has paid in defending them in the E&O Action; and (c) providing such other and further relief as this Court may deem just and equitable.

## COUNT IV

### Damages vs. CPLF and the Individual Defendants (Reimbursement)

106.    Imperium repeats, realleges and incorporates by reference each and every allegation contained in the preceding paragraphs of this Complaint as though fully set forth herein.

107.    Insofar as there is no coverage under the Imperium Policy, Imperium has no duty to defend or indemnify CPLF or the Individual Defendants in the E&O Action.

108.    CPLF and the Individual Defendants individually and collectively should be ordered to reimburse Imperium with respect to the fees, costs and expenses it has paid and will pay in defending them in the E&O Action as well as for any and all other damages that Imperium has incurred or may incur in connection with their defense in the E&O Action.

WHEREFORE, Imperium seeks a judgment (a) awarding damages to Imperium in an amount equivalent to the costs and expenses it has paid in defending CPLF and the Individual

Defendants in the E&O Action; (b) Ordering that CPLF and the Individual Defendants reimburse Imperium with respect to the fees, costs and expenses it has paid in defending them in the E&O Action; and (c) providing such other and further relief as this Court may deem just and equitable.

**RELIEF REQUESTED**

WHEREFORE, the Plaintiff, IMPERIUM INSURANCE COMPANY prays that this Honorable Court declare and adjudicate the rights and liabilities of the parties regarding the Imperium Policy together with the following relief:

a.      Declaring that Imperium does not owe a duty to defend CPLF or the Individual Defendants under the Imperium Policy with respect to the E&O Action;

b.      Declaring that Imperium does not owe a duty to indemnify CPLF or the Individual Defendants under the Imperium Policy with respect to the E&O Action;

c.      Declaring that Imperium is entitled to reimbursement from CPLF and the Individual Defendants of all defense costs paid by Imperium with respect to the E&O Action;

d.      Ordering CPLF and the Individual Defendants to reimburse Imperium for the fees, costs and expenses Imperium has paid in defending them in the E&O Action; and

e.      Such other and further relief as the Court deems just and equitable.

> **TRAUB LIEBERMAN STRAUS &**
> **SHREWSBERRY LLP**
> Attorneys for Plaintiff
> IMPERIUM INSURANCE COMPANY
>
>
> By: _____/s/  Richard J. Bortnick_____
>       Richard J. Bortnick, Esq.
>       322 Highway 35 South
>       Red Bank, New Jersey 07701
>       Tel. No. 732-985-1000

Dated:  June 18, 2019